**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **HAMIDULLAH**       ) <br>      **Detainee,**     ) <br>      **United States Air Force Base at**   ) <br>      **Bagram, Afghanistan, and**   ) | |

**HAMIDULLAH**   )
    **Detainee,**   )
    **United States Air Force Base at**   )
    **Bagram, Afghanistan, and**   )
       )
**WAKEEL KHAN**   )
    **as Next Friend to HAMIDULLAH,**   )
       )
    **Petitioners,**   )
       )
**v.**   )
       )      **Civil No. 10-758**
**BARACK OBAMA**   )
    **President of the United States**   )
    **The White House**   )
    **1600 Pennsylvania Avenue, NW**   )
    **Washington, DC 20500**   )
       )
**ROBERT M. GATES**   )
    **Secretary of Defense**   )
    **The Pentagon**   )
    **Washington, DC 20301**   )
       )
**COL. JACK L. BRIGGS II**   )
    **Commander,**   )
    **Bagram Air Field**   )
    **Bagram, Afghanistan, and**   )
       )
**JOHN AND/OR JANE DOES**   )
    **Nos. 1 - 5**   )
    **Custodians**   )
    **United States Air Force Base at**   )
    **Bagram, Afghanistan,**   )
       )
    **Respondents/Defendants**   )
_____ )

## FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS

   1. Petitioner Hamidullah ("Petitioner" or "Hamidullah"), a citizen of Pakistan, has

been in the exclusive custody and control of the United States government since he was a 14 year old child.  He was seized in Pakistan, far from any battlefield, and was illegally rendered to Afghanistan against his will.  Though he has never taken up arms or supported hostilities against the United States or its allies in Afghanistan, or any other country, Hamidullah has been imprisoned for more than two years without charge in US military custody at Bagram Air Base in Afghanistan ("Bagram").  Respondents have refused to provide Petitioner with any meaningful opportunity to challenge the legality of his detention in any civilian or military tribunal.  Despite Hamidullah's repeated requests to meet with counsel, Respondents have prevented him from communicating with any lawyers.

2.  Petitioner is being held in violation of the Constitution, laws, and treaties of the United States, as well as in violation of customary international law. Accordingly, this Court should issue a Writ of Habeas Corpus compelling Respondents either to release Petitioner or to establish a lawful basis for his detention; and should order injunctive, declaratory, or other relief as necessitated by domestic or international law.

## I. JURISDICTION

3.  Petitioner, via his Next Friend, brings this action pursuant to 28 U.S.C. §§ 2241-2242, and invokes this Court's jurisdiction under 28 U.S.C. §§ 1331, 1651 and 2201-2, as well as Article I, Section 9, Clause 2; Article III, Section 2; and the Fifth and Sixth Amendments to the U.S. Constitution.

4. This Court is also empowered to entertain this Petition pursuant to the United States Supreme Court's rulings in *Boumediene v. Bush*, 553 U.S. 723 (2008), *Hamdan v. Rumsfeld*, 548 U.S. 557 (2006), and *Rasul v. Bush*, 542 U.S. 466 (2004), because the U.S. detention facility at Bagram is subject to the exclusive jurisdiction and control of the U.S. government.

5. The Court is also empowered to declare the rights and other legal relations of the parties herein by 28 U.S.C. § 2201, to effectuate and enforce declaratory relief by all necessary and proper means by 28 U.S.C. § 2202, as this case involves an actual controversy within the Court's jurisdiction, and to issue all writs necessary or appropriate in aid of its jurisdiction by 28 U.S.C. § 1651.

6. This Court has personal jurisdiction over President Obama and Secretary Gates because they are residents of this District.  The Court has personal jurisdiction over Col. Briggs and the Doe defendants pursuant to 28 U.S.C. § 1391(e) and Rules 4(i)(2) and 4(k) of the Federal Rules of Civil Procedure.

## II. VENUE

7. Venue is proper in the United States District Court for the District of Columbia pursuant to 28 U.S.C. § 1391(b) & (e) because (1) Respondents President Obama and Secretary Gates reside in the District of Columbia, (2) a substantial number of the acts and omissions which gave rise to this suit took place in the District of Columbia, (3) Respondents are all officers or employees of the United States or an agency thereof acting in his or her official capacity.

3

## III.  PARTIES

8. Petitioner Hamidullah, a citizen of Pakistan, is held in the unlawful custody of the United States Government at the U.S. military detention facility in Bagram, Afghanistan ("Bagram Prison").

9. Because the U.S. government is holding Hamidullah virtually incommunicado and without access to counsel, and because Hamidullah is a juvenile, his father, Wakeel Khan ("Wakeel"), acts as his "Next Friend" in filing this petition for a writ of habeas corpus on behalf of Hamidullah.  *See* Next Friend Authorization Form, attached to the initial Petition as Exhibit A.

10. Respondent Barack Obama is the President of the United States and Commander-in-Chief of its Armed Forces.  Accordingly, Respondent Obama is ultimately responsible for the unlawful detention of Hamidullah at Bagram Prison. President Obama is sued in his official capacity.

11. Respondent Robert M. Gates is the Secretary of Defense of the United States. He ultimately controls Bagram Prison and detention operations there, and supervises those holding Hamidullah in U.S. military custody.  Secretary Gates is sued in his official capacity.

12. Respondents Col. Jack L. Briggs II and John/Jane Does 1 through 5 ("Doe Respondents") are the commanding officers at Bagram Prison, and Petitioner is in their immediate physical custody.  Petitioners will amend this Petition when they ascertain the true names of the Doe Respondents.  Col. Briggs and the Doe Respondents are also sued in their official capacities.

## IV.  STATEMENT OF FACTS

### Petitioner Hamidullah

13. Hamidullah is a citizen of Pakistan.  He was born on ~~redacted~~ 1993, and is now sixteen (16) years old.

14. Wakeel Khan is Hamidullah's father.  From 1971 to 1976, Wakeel served in the Pakistan Army as a soldier.  Currently, he works as a security guard.

15. Hamidullah was a student at Rehmat English School where Wakeel paid his school fees of Rs. 350 per month.  When it became too expensive for Wakeel to continue paying for Hamidullah's education, Hamidullah dropped out of school and took a job with a local doctor.

16. Wakeel's family was originally from a village in South Waziristan, but they settled in Karachi before Hamidullah was born. However, Wakeel still helped to maintain his family home in his ancestral village in Waziristan.

17. In July 2008, Wakeel decided that he should retrieve his family's belongings from their village in Waziristan because of the ongoing military operations in the area.  Wakeel could not travel to Waziristan at the time because of work commitments, so he asked Hamidullah to make the trip for him.  Wakeel arranged for a friend, Khairullah, to accompany his son.   Wakeel had no reason to expect that the Pakistani authorities would do Hamidullah any harm.

18. Hamidullah left Karachi at 7:30 am on July 26, 2008.  At the time, he was 14 years old.  The family has not seen Hamidullah since that day.

19. Khairullah lives near Wakeel in Karachi.   Khairullah also had to travel to his

village in Dira Ismail Khan, which is on the way to Waziristan.  Hamidullah and Khairullah traveled together on the 26th of July by bus to get to their respective villages.  They reached Dira Ismail Khan the next day at around 8am and Khairullah got off the bus, while Hamidullah continued on another 120 kilometers to his village. Hamidullah asked Khairullah to wait for him, saying he would come back to Dira Ismail Khan two days later, and they could return to Karachi together.

20. Khairullah waited for a few days for Hamidullah, but his friend never showed up. Because mobile phone service in Hamidullah's area is poor, Khairullah called Wakeel in Karachi.  Wakeel said he had not heard from his son either, and so on the 7th or 8th of August, Khairullah left for Karachi.

21. Wakeel eventually learned that Hamidullah had reached the family village safely, and stayed with his maternal grandparents there.  When he went missing, his grandparents initially thought that Hamidullah had left to return for Karachi without telling them. Wakeel later learned that his son had only about 150 Rupees (less than $2.00) at the time and he had been searching for work to earn enough money to return home.  In addition, because he was only 14, Hamidullah did not carry a proper ID, which may explain why the authorities detained him improperly. When Wakeel realized that something was wrong, he left Karachi to try to find his son.  His search became increasingly desperate.  Local authorities in Waziristan reported that they had no information on the whereabouts of Hamidullah.

6

22. Wakeel knew that he would not get a straight answer from the Pakistani authorities, since people disappear routinely in his community without recourse.

23. It was not until several months later, in January 2009, that the family first heard from Hamidullah through the ICRC.  Wakeel knew that the ICRC was a reliable organization because of his own days in the army.  Wakeel first met the ICRC representative in Peshawar, as part of his ongoing efforts to locate his young son.

24. Some months later, the family received a picture of Hamidullah taken in Bagram.

25. On March 12, 2010, Hamidullah was able to speak to his family through the ICRC for the first time, confirming that he was alive and incarcerated at Bagram. Hamidullah informed his family that a "committee" (presumably a Detainee Review Board, or DRB) at Bagram had told him that they have no evidence against him.

26. Hamidullah's rendition from Pakistan to Afghanistan was unlawful and in violation of Pakistan, US and international law.

27. Since Petitioner's disappearance, his family has suffered severe emotional hardship.

28. Despite having held Petitioner Hamidullah for almost two years, Respondents have not provided his family with any official notification of why he is being detained, when he will be released, whether he will be tried, or how the family might assist in vindicating their son of any allegations being made against him.

29. Upon information and belief, agents of the United States government have

interrogated Petitioner repeatedly.

30. Upon information and belief, Petitioner has never been charged with a specific offense, nor has he ever been notified of any pending or contemplated charges against him in any jurisdiction.

31. Upon information and belief, Petitioner Hamidullah has never been permitted to meet or speak with a lawyer of any kind.  No lawyer has been permitted access to him, and Respondents have intentionally and systematically interfered with his right to confer with counsel.

32. Upon information and belief, Petitioner Hamidullah has never seen, much less had the opportunity to rebut, the evidence upon which the U.S. government purportedly relies as a basis for his initial detention and continued imprisonment.

33. Upon information and belief, Petitioner Hamidullah has not been informed of his rights under U.S. or international law.

34. Upon information and belief, Petitioner Hamidullah has not been segregated from adults or been accorded treatment appropriate to his age and legal status, nor has he received rehabilitation treatment, special education, or other special rights in recognition of his juvenile status during his detention and interrogation.

### Petitioner is Not an Enemy Combatant or Belligerent

35. Petitioner has never been accused or convicted of any crime in Afghanistan, Pakistan, or any other country.

36. Petitioner is not an "enemy combatant" who was "part of or supporting forces hostile to the United States or coalition partners in Afghanistan and who [were]

engaged in an armed conflict against the United States there." *Hamdi v. Rumsfeld*, 542 U.S. 507, 516 (2004).

37. Petitioner is not an "unlawful enemy combatant" defined in the Military Commissions Act of 2006, Pub. L. No. 109-366, 120 Stat. 2600 (Oct. 17, 2006) (enacting 10 U.S.C. ch. 47(a), amending 28 U.S.C. § 2241), as:

    i.    a person who has engaged in hostilities or who has purposefully and materially supported hostilities against the United States or its co-belligerents who is not a lawful enemy combatant (including a person who is part of the Taliban, al Qaeda, or associated forces); or

    ii.    a person who, before, on, or after the date of the enactment of the Military Commissions Act of 2006, has been determined to be an unlawful enemy combatant by a Combatant Status Review Tribunal or another competent tribunal established under the authority of the President or the Secretary of Defense.

38. Petitioner is not an "unprivileged enemy belligerent" as that term has been most recently defined by Respondents, who define "unprivileged enemy belligerents" as:

Persons who planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, and persons who harbored those responsible for those attacks . . . [and] persons who were part of, or substantially supported, Taliban or al-Qaida forces or associated forces that are engaged in hostilities against the United States or its coalition partners, including any person who has committed a belligerent act, or has directly supported hostilities, in aid of such enemy armed forces.

See Brief for Respondents-Appellants at the Addendum, *Maqaleh v. Gates*, No. 09-5265 (D.C. Cir. Sept. 14, 2009).

39. On September 18, 2001, a Joint Resolution of Congress (the "AUMF") authorized President George W. Bush to use military force against those "nations, organizations, or persons" that "planned, authorized, committed, or aided the

terrorist attacks on September 11, 2001, or [that] harbored such organizations or persons."  Pub. L. No. 107-40, 115 Stat. 224 (2001).

40. Hamidullah did not participate in the planning or commission of the September 11 attacks, nor did he harbor any persons or organizations that participated in them.  On September 11th, Hamidullah was 7.

41. Hamidullah is not otherwise properly detained pursuant to the President's authority as Commander-in-Chief either under the laws and usages of war or the AUMF.

42. On November 13, 2001, President Bush issued an Executive Order authorizing indefinite detention without due process of law (the "Executive Order" or "Order"). The Order authorizes the Secretary of Defense, now Respondent Gates, to detain anyone the President has "reason to believe":

   i.    is or was a member of the organization known as al Qaida;

   ii.   has engaged in, aided or abetted, or conspired to commit, acts of international terrorism, or acts in preparation therefore, that have caused, threaten to cause, or have as their aim to cause, injury to or adverse effects on the United States, its citizens, national security, foreign policy, or economy; or

   iii.  has knowingly harbored one or more individuals described in subparagraphs (i) and (ii)

   See Executive Order, 66 Fed. Reg. 57833 § 2 (Nov. 13, 2001).

43. The Executive Order purportedly vests the President with complete discretion to identify the individuals that fall within its scope.  The President must make this determination in writing.  The Order authorizes detainees that fall within its scope to be held indefinitely, without charges, consular access, or access to a tribunal.

The Order further does not provide for judicial review of any actions taken pursuant to the Order.

44. Hamidullah had no involvement, direct or indirect, in the terrorist attacks on the United States on September 11, 2001, the ensuing armed conflict, or any act of international terrorism attributed by the United States to al Qaida or any other terrorist organization.

45. Even if Hamidullah had been involved with an enemy group, as a child under the age of 15 his acts would not carry the same consequences, as reflected in a long line of domestic and international law.  Under the Child Soldiers Accountability Act of 2008, Pub. L. No. 110-340, 122 Stat. 3735 (Oct. 3, 2008) (codified at 18 U.S.C. § 2442), for instance, Congress provided a form of universal jurisdiction for criminal actions against persons who recruit, enlist, or conscript persons under 15 years of age in an armed force or group, or who use persons under 15 years of age to participate actively in hostilities.   The Child Soldiers Accountability Act and the Child Soldiers Prevention Act of 2008, Pub. L. No. 110-457, §§ 401-407, 122 Stat. 5044, 5087 (Dec. 23, 2008) (codified at 22 U.S.C. § 2370c), reflect a Congressional policy that persons under 15 years of age are not soldiers or combatants in the same sense as adults, and that such persons should be protected and reintegrated, not incarcerated.  *See* Child Soldiers Prevention Act, § 403 (setting forth the sense of Congress that the United States Government should "condemn the conscription, forced recruitment or use of children"; should "lead efforts to uphold international standards

designed to end the abuse" of those practices; and "should expand ongoing services to rehabilitate recovered child soldiers and to reintegrate such children back into their respective communities"). These policies are also reflected in international humanitarian law, including in the 1949 Geneva Conventions and in the 1977 Additional Protocols to the Geneva Conventions, at Article 77(2) and (3) of Additional Protocol I and Article 4(3) of Additional Protocol II.

46. Hamidullah is not otherwise properly subject to the Executive Order.

### Bagram Prison

47. Since 2002, the United States has detained indefinitely thousands of people in harsh conditions without access to lawyers, courts, or a meaningful process to challenge their detention at the U.S. prison at the Bagram Air Base in Afghanistan. On information and belief, the United States has transferred Petitioner from the old prison building complex at Bagram to a newly built prison facility. The new prison where Petitioner is now being held (named "Parwan") is physically located on Bagram Air Base and is under the complete control of the United States government.

### The United States' Exclusive Jurisdiction and Control over Bagram

48. The U.S. Army Task Force under the U.S. Central Command operates Bagram Air Base, a permanent U.S. Air Base situated approximately 40 miles north of Kabul.

49. The Air Base is subject to the exclusive jurisdiction and control of the U.S. military.

50. Pursuant to the lease agreement executed by the U.S. and Afghan governments, Afghanistan ceded exclusive use and control of Bagram Air Base to the United States. Accommodation Consignment Agreement for Lands and Facilities at Bagram Airfield between the Islamic Republic of Afghanistan and the United States of America [hereinafter Lease], entered on Sept. 28, 2006. The Lease grants the United States "exclusive use," "exclusive control," and "exclusive, peaceable, undisturbed and uninterrupted possession," of all facilities and land at Bagram Airfield, without cost, and without interference by the Afghan government. The Lease continues in effect in perpetuity unless and until the United States determines unilaterally that it "no longer require[s]" use of the base.

51. Pursuant to a separate agreement between the U.S. and Afghan governments, U.S. civil and military personnel at Bagram are subject only to U.S. jurisdiction, not Afghan jurisdiction, and cannot be transferred to Afghan courts, an international tribunal, or any other country without U.S. consent. Diplomatic Note, No. 202, Embassy of the United States of America in Kabul, Afghanistan at 3, dated Sept. 26, 2002 [hereinafter Note No. 202]; Doc. No. 93, Transitional Islamic State of Afghanistan, Ministry of Foreign Affairs at 1, dated May 28, 2003. Third party civil claims against U.S. personnel are addressed by the United States at its discretion. *Id.* at 3. U.S. contracts for materials and services at Bagram are exempt from Afghan taxes and are awarded in accordance with U.S. law. *Id.* at 2.

52. The United States exercises exclusive control over detention operations at

Bagram prison.   Neither NATO forces nor Afghan forces play any role in the operation of Bagram prison.   Detainees at Bagram are in the immediate physical custody of U.S. soldiers who answer only to the U.S. chain of command.

53. Bagram detainees do not have access to any court, Afghan or otherwise.

54. It may be that Respondents wish to pass the responsibility for Petitioner's detention on to the Afghan government at some point in the future.   To do so would be a manifest violation of Petitioner's rights.   Petitioner is not Afghani, and has no connection to Afghanistan.   On information and belief, he had never been to Afghanistan until the U.S. took him there.   To turn him over to the highly suspect Afghan detention program would be an additional violation of his rights.

55. On information and belief, the Pakistan Embassy in Kabul has made efforts to obtain access to Petitioner in Bagram, but those efforts have been thwarted by the U.S. authorities.

56. On information and belief, the Pakistan Government wishes to have Petitioner returned to Pakistan as soon as possible.   The Pakistani government has repeatedly taken up the issue of Pakistani prisoners, including Petitioner, with the U.S. and sought their release.   Pakistan has repeatedly raised this issue with the U.S. at the highest political and diplomatic levels.

**Detainee Population and Prison Conditions**

57. The U.S. government is currently detaining several hundred people at Bagram, many of whom have been held there for lengthy periods over the past seven years.   *See* David Cloud and Julian Barnes, *U.S. May Expand Use of its Prison*

*in Afghanistan*, L.A. Times, Mar. 21, 2010.    The U.S. government claims the authority to detain people at Bagram indefinitely.

58. In the past, Bagram was used as a "temporary 'collection center' where some detainees stop over en route to their permanent location"—typically Guantánamo. See U.S. Dep't of State, Information Memorandum re: Nationalities at Bagram (2002); Emily Bazelon, From Bagram to Abu Ghraib, Mother Jones, Mar. 1, 2005, at 50.

59. When the Supreme Court ruled in June 2004 that Guantanamo Bay prisoners had habeas rights, the number of transfers from Bagram to Guantánamo dropped almost to zero and the detainee population at Bagram ballooned. Tim Golden, Foiling U.S. Plan, Prison Expands in Afghanistan, N.Y. Times, Jan. 7, 2008 (noting that Bagram population was about 100 detainees in early 2004, but increased to more than 500 by 2007). The shift was attributed, "according to military figures, [] in part [as] a result of a Bush administration decision to shut off the flow of detainees into Guantánamo after the Supreme Court ruled that those prisoners had some basic due-process rights." Tim Golden & Eric Schmitt, A Growing Afghan Prison Rivals Bleak Guantánamo, N.Y. Times, Feb. 26, 2006.

60. Bagram detainees have been detained for years in harsh conditions.   Both military personnel and former detainees described the prison conditions at Bagram as far worse than those at Guantanamo. Golden & Schmitt, *A Growing Afghan Prison Rivals Bleak Guantánamo*, at 2 (New York Times, Feb. 26, 2006) (quoting a Defense Department official who had toured both detention facilities

15

who said "[a]nyone who has been to Bagram would tell you it's worse"); *see also* Nicholas D. Kristof, *Sami's Shame, And Ours*, N.Y. Times, Oct. 17, 2006, at 21 (quoting a former prisoner of Bagram and Guantanamo describing his time at Bagram as "the longest days of [his] life"); Pamela Constable, *An Afghan Boy's Life in U.S. Custody: Camp in Cuba Was Welcome Change After Harsh Regime at Bagram*, Wash. Post, Feb. 12, 2004, at A 1 (noting that thirteen-year-old boy's detention at Guantanamo was "in sharp contrast to the harrowing month and a half he spent at Bagram").

61. Allegations of torture, abuse, and mistreatment of detainees at Bagram are well documented.  Former detainees have described being sexually abused and humiliated; stripped and photographed in obscene positions; threatened with dogs; beaten; subjected to "mock executions"; forced into stress positions for prolonged periods of time; and subjected to sensory, sleep, and food deprivation. In addition, detainees at Bagram have been forbidden to look at or talk to each other, and have risked punishment for doing so. *See Ex-detainees allege Bagram abuse,* BBC News, June 24, 2009, available at http://news.bbc.co.uk/1/hi/world/south_asia/8116046.stm; *see also From Bagram to Abu Ghraib*, Mother Jones, March/April 2005, available at http://motherjones.com/politics/2005/03/bagram-abu-ghraib.

62. A number of detainees died in U.S. custody at Bagram—at least two of these deaths were deemed homicide by Army investigators. See Tim Golden, *Army Faltered in Investigating Detainee Abuse*, N.Y. Times, May 22, 2005; *see also*

American   Civil   Liberties   Union,   *Autopsy   Reports*,   available   at http://action.aclu.org/torturefoia/released/102405.    Both detainees had been chained to the ceiling for days at a time and were brutally beaten to death.  See Julian Borger, *Report Implicates Top Brass in Bagram Scandal*, Guardian (London), May 21, 2005, at 4.

63. In late 2009, Respondents began using a new building for detainee operations at Bagram and made improvements to the prison facilities. *See U.S. gives tour of new Afghan detention center*, Wash. Post, Nov. 16, 2009.

64. Despite the prison renovations, detainee abuse at the hands of interrogators continues at Bagram.  *See* Joshua Partlow & Julie Tate, *Two Afghans Allege Abuse at U.S. Site:  Teenagers Say They Were Interrogated at Secretive Bagram Holding Center*, Wash. Post, November 28, 2009, at A 1 (citing interviews with two teenagers who claim that they were beaten by American guards, photographed naked, deprived of sleep and held in solitary confinement in concrete cells in 2009).

### The Lack of Due Process Afforded to Prisoners in Bagram to Challenge their Detention

65. Major General Douglas Stone estimated in 2009 that two-thirds of the detainees at Bagram were innocent and should be released.  Jon Boone, *U.S. to Tackle Breeding Ground for Insurgents in Afghan Jails*, Guardian (London) Oct. 14, 2009.

66. Over the past eight years, hundreds of detainees have languished in Bagram without being told why they are being detained, without access to lawyers,

without any judicial forum in which they are able to challenge their detention, and without any meaningful or adequate administrative process to challenge the basis for their detention.

67. In December 2009, the administration began the implementation of a new review process for determining whether indefinite detention was permissible.  Under the new procedures, a detainee's status is determined by going before the newly established "Detainee Review Board" ("DRB").

68. Even under the new process, Bagram prisoners are not permitted any access to lawyers. *See* Fixing Bagram, Human Rights First at 8, Nov. 2009, available at http://www.humanrightsfirst.info/pdf/Fixing-Bagram-110409.pdf.   The military assigns a "personal representative" to each detainee.  *See* Detainee Review Procedures at Bagram Theater Internment Facility, Afghanistan at 3 [hereinafter Detainee Review Procedures], approved July 2, 2009.  The representative is actually a member of the U.S. military responsible to the chain of command.  *See id.* at 5.  Personal representatives are not attorneys and are not bound by any duty of confidentiality, zealous advocacy, or loyalty to the detainee.  *See* Fixing Bagram at 12.  On information and belief, those detainees who have requested that their attorneys participate in the process have been denied.

69. Bagram prisoners are not permitted any access to a judge or an independent and impartial tribunal.   The DRB panel is comprised of three military officers responsible to the U.S. chain of command.  These officers need not be lawyers. The officers are appointed, and can be removed at will, by the military convening

authority.

70. The detainees are not entitled to see most of the evidence the U.S. military is relying upon to justify their detention. Prisoners must receive timely notice of the basis for their detention and an unclassified summary of the evidence against them, but are denied access to any classified evidence in the government's possession.

71. DRBs may rely on classified evidence or evidence obtained through torture or coercion.

72. The military has no obligation to disclose relevant exculpatory information to the detainee or his personal representative.

73. The detainee can be excluded from his own hearing if "operational" concerns arise as to his presence.

74. DRB determinations cannot be appealed to any court or any higher, independent and impartial administrative body.

75. No special precautions are taken when dealing with juveniles in Bagram detention.

### The Indefinite Detention of Foreign Detainees at Bagram Prison

76. On September 18, 2009, Robert Gates, the Secretary of Defense, established a new command, Joint Task Force 435 ("JTF 435"), to assume responsibility for U.S. detention operations in Afghanistan and to provide leadership for the new detention facility in Parwan province. According to the United States Central Command, the detention mission of JTF 435 includes overseeing the detainee

review process, implementing programs for the peaceful reintegration of detainees into Afghan society, and coordinating with other agencies "for the promotion of the rule of law in Afghanistan." See Press Release, United States Central Command, JTF 435, "Khowst Governor Hosts Release Shura for Former Detainees," Aug. 9, 2010, available at www.centcom.mil/news.

77. Beginning in January of 2010, the Executive implemented a number of significant operational and substantive changes to the U.S. detention system in place on Bagram Air Force Base.

78. In January 2010, JTF 435 took control of detention operations in Afghanistan. According to Navy Vice Admiral Robert S. Hayward, 1200 U.S. troops comprise the detention task force. See Lisa Daniel, "Task Force Ensures Fair Detainee Treatment, Commander Says," American Forces Press Service, Aug. 6, 2010, available at www.defense.gov.

79. On January 9, 2010, the U.S. and Afghan governments announced that they had reached an agreement regarding the planned transfer of Afghan detainees held in U.S. custody in Bagram Prison to Afghan custody in the newly constructed facility located on the edge of the Air Base called the "Parwan Facility."  See Press Release, United States Central Command, JTF 435, "Afghan ministers accept responsibility of Parwan Detention Facility," Jan. 10, 2010.

80. The January 9 Memorandum of Understanding, signed by the Afghan Minister of Defense, Attorney General, and Deputy Minister of Justice and the Deputy U.S. Ambassador to Afghanistan, the U.S. Commander of the International Security

Assistance Force, and the Commander of Joint Task Force 435, is intended to "guide the process for the Ministry of Defense to take the lead on assuming responsibility for the newly-completed U.S. Detention Facility in Parwan," and to "eventually transfer its role as custodian and manager of the facility to the Ministry of Justice, Central Prisons Directorate at a time to be determined by the President of the Islamic Republic of Afghanistan." *Id.* According to the MOU, personnel from the key Afghan ministries will work alongside American personnel through the transition from American to Afghan control of the facility. *Id.*

81. During the first half of 2010, the U.S. transferred its detainees from Bagram Prison to the Parwan Facility, but did not transfer custody of the prisoners. See Heidi Vogt, "US prison in Afghanistan to hold first trial", The Boston Globe, May 26, 2010 (by May 2010, detainees were housed in the Parwan Facility).

82. In March 2010, the Executive announced its decision to hand over control of the Parwan Facility and custody of the Afghan detainees held in those facilities, to the Afghan government in 2011. See Press Release, International Security Assistance Force, Afghanistan, "ISAF hosts Afghan corrections conference," Mar. 27, 2010 (U.S. and Afghan officials state that "the full responsibility of the [Parwan] Detention Facility" will be handed to the Afghans in 2011).

83. In May 2010, the Executive released its updated National Security Strategy Plan which expressly reserved for the Executive the option of detaining individuals seized during counterterrorism operations indefinitely and without charge. See The White House, "National Security Strategy" 36, May 27, 2010 (noting that the

U.S. "will prosecute terrorists in Federal courts or in reformed military commissions that are fair, legitimate, and effective" only "when we are able").

84. On June 1, 2010, the U.S. Military allowed Afghan prisoners held in Bagram Prison to appear for the first time in a jointly U.S.-Afghan run proceeding similar to an indictment or arraignment.   *See* Jonathon Burch, "First all-Afghan trial opens in US jail at Bagram," Reuters, June 1, 2010 (noting this represents "a step towards letting Afghans be tried by their own countrymen," while implicitly recognizing that it does not address the detention of foreigners on Afghan soil).

85.  On June 8, 2010, the Executive announced it planned to request that the Afghan government permit the U.S. military to retain control over a section of the Parwan Facility.  See Julian Barnes, "U.S. may seek use of Afghan prison", L.A. Times, June 8, 2010.

86. On June 9, 2010, the Executive stated that it planned to use the U.S.-controlled portion of the Parwan Facility to hold and interrogate persons, like Hamidullah, seized from countries outside Afghanistan. See Julian Barnes, U.S. hopes to share prison with Afghanistan, L.A. Times, June 9, 2010.

87.  On August 6, 2010, it was reported for the first time that the Executive had purposely instituted a reverse flow from Guantánamo, moving prisoners to other detention sites specifically to avoid habeas jurisdiction. See Matt Apuzzo and Adam Goldman, CIA Flight Carried Secret from Gitmo, Associated Press (Aug. 6, 2010) (recounting the transfer of four prisoners from Guantánamo to Morocco several weeks before the Supreme Court's decision in Rasul specifically to avoid

potential habeas jurisdiction).

88. Jurisdiction in this case is not foreclosed by the decision in *Al Maqaleh v. Gates*, 605 F.3d 84 (D.C. Cir. 2010), in part because of the substantial differences in the factual predicates in the two cases as applied to the jurisdictional factors considered by the Court of Appeals.   First, Petitioner's status as a juvenile entitles him to the special solicitude of the courts and the enforcement of legislative and humanitarian policies requiring reintegration of alleged child soldiers.  Second, the process afforded to Petitioner was particularly inadequate given that he is a juvenile who is forced to defend himself without counsel and without the involvement of his parents and legal guardians.  Third, the practical obstacles in granting the writ to persons who were detained when they were under 15 are minimal.  Age verification is typically a simple process that will not seriously interfere with respondents' military activities, and the population of detainees who are under 15 is, or should be, exceedingly small.  Fourth, petitioner's youth should be a relevant jurisdictional factor in its own right, and that factor warrants exercise of habeas jurisdiction by this Court.  Finally, as a child of 14 at the time of his detention, Petitioner cannot have been determined by the United States to be properly detained as an "enemy combatant" or a person awaiting such determination, and therefore the jurisdictional bar of the Military Commissions Act of 2006, codified at 28 U.S.C. § 2241(e)(1), does not prohibit jurisdiction in this matter.

## V. CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF

Violation of the Suspension Clause –
Article I of the United States Constitution

89. Petitioners incorporate by reference all preceding paragraphs as if set forth fully herein.

90. Respondents' arrest and continued detention of Petitioner without charge or trial violate his constitutional right to the Writ of Habeas Corpus as protected by the Suspension Clause, Art. I, § 9, cl. 2, which guarantees an adequate and meaningful judicial process.

91. To the extent that the November 13, 2001, Executive Order and the Military Commissions Act disallow any challenge to the legality of Petitioner's detention by way of habeas corpus, those provisions constitute an unlawful suspension of the Writ in violation of Article I.

### SECOND CLAIM FOR RELIEF

Unlawful Detention –
Article II of the United States Constitution

92. Petitioners incorporate by reference all preceding paragraphs as if set forth fully herein.

93. Because Petitioner is not, nor has he ever been, an enemy alien, lawful or unlawful belligerent, or combatant of any kind, and was a civilian who was not carrying a weapon against American troops on a foreign battlefield, the Executive lacks the authority to order or direct military officials to detain him.

94. By the actions described above, the President has exceeded and continues to

exceed the Executive's authority under Article II of the United States Constitution by (1) authorizing, ordering, and directing military officials to seize Petitioner, and to transfer him to military detention, and by (2) authorizing and ordering his continued military detention.

95. Respondents acted, and continue to act, without lawful authority by directing, ordering, and/or supervising the seizure and military detention of Petitioner.

96. To the extent that Respondents assert that Petitioner's detention is authorized by the November 13, 2001 Executive Order, that Order exceeds the Executive's authority under Article II and is ultra vires and void both as applied to Petitioner and on its face.  The military seizure and detention of Petitioner by Respondents is ultra vires and illegal because it is in violation of Article II of the United States Constitution.  The Order was neither authorized nor directed by Congress, and is beyond the scope of the Joint Resolution providing the AUMF passed by Congress on September 14, 2001.

97. To the extent that Respondents assert that their authority to detain Petitioner derives from a source other than the Executive Order, including without limitation the Executive's inherent authority to conduct foreign affairs or to serve as Commander-in-Chief of the U.S. Armed Forces, whether from Article II of the Constitution or otherwise, Respondents lack that authority as a matter of fact and law.

98. By the actions described above, Respondents, acting under color of law, have denied and continue to deny Petitioner Hamidullah the due process accorded to

persons seized and detained by the U.S. military in times of armed conflict as established by the Third and Fourth Geneva Conventions. Violations of the Geneva Conventions are direct treaty violations and violations of customary international humanitarian law, and constitute enforceable claims under 28 U.S.C. § 2241(c)(3). Respondents are liable for this conduct described above, insofar as they directly or indirectly facilitated, ordered, acquiesced, confirmed, ratified, or conspired to violate the Geneva Conventions.

99. Respondents violated Petitioner's right to be free from forced disappearance and unlawful detention, and have denied and continue to deny Petitioner the process due to persons seized and detained by the United States as established by Articles 9 and 14 of the International Covenant on Civil and Political Rights, G.A. res. 2200A (XXI), 21 U.N. GAOR Supp. (No. 16), at 52, U.N. Doc. A/6316 (1966), 999 U.N.T.S. 171, entered into force March 23, 1976. Violation of the ICCPR is a treaty violation directly enforceable by the Court under 28 U.S.C. § 1331 and the Supremacy Clause of the U.S. Constitution.

100.    Because Respondents are detaining Petitioner "in violation of the Constitution or laws or treaties of the United States," Petitioners' claims arise under 28 U.S.C. § 2241(c)(3), and Petitioner is entitled to habeas relief.

### THIRD CLAIM FOR RELIEF

Violations of Common Law and Statutory Habeas -
28 U.S.C. § 2241(c)(1) and (c)(3)

101.    Petitioners incorporate by reference all preceding paragraphs as if set forth fully herein.

102.     Respondents, acting under color of law, have violated and continue to violate common law principles of due process, as protected and codified by 28 U.S.C. § 2241(c)(1) and (c)(3), in that Respondents have incarcerated Petitioner for more than two years, without lawful process, and without means to test the legal and factual basis for his continued incarceration in the custody of the United States, in violation of the Constitution or laws or treaties of the United States.

103.     Respondents' recently announced plans to maintain control indefinitely over a portion of the detention facility at Bagram, even after transferring custody and control of Afghan prisoners at the Parwan Facility to the Afghan government next year, demonstrate a continued intent to keep Petitioner imprisoned beyond the rule of law in violation of the Suspension Clause.

104.     Accordingly, Petitioner is entitled to habeas, declaratory, and injunctive relief.

## FOURTH CLAIM FOR RELIEF

Unlawful Arbitrary Detention and Denial of Due Process -
Due Process Clause of Fifth Amendment to of the United States Constitution

105.     Petitioners incorporate by reference all preceding paragraphs as if set forth fully herein.

106.     Respondents, acting under color of law, continue to detain Petitioner in violation of his right to due process under the Fifth Amendment to the United States Constitution.

107.     The President has ordered the prolonged, indefinite, and arbitrary detention of Petitioner, without due process of law, and the other Respondents

have implemented those orders.

108.       Respondents' actions deny Petitioner the process accorded to persons

detained by the Executive, including meaningful notice of allegations, the right to

see and rebut any evidence against him, and a fair and meaningful hearing

before an impartial tribunal.

### FIFTH CLAIM FOR RELIEF

Denial of Counsel and Access to the Courts –
Fifth and Sixth Amendments to of the United States Constitution

109.       Petitioners incorporate by reference all preceding paragraphs as if set

forth fully herein.

110.       Respondents have denied Petitioner access to counsel, and Petitioner has

made no appearance before either a military or civilian court.

111.       By denying Petitioner access to counsel or the courts to present his valid

claims as stated herein, Respondents, acting under the color of law, have

violated his rights under the Fifth and Sixth Amendments to the United States

Constitution.

112.       Petitioner is not an enemy alien, lawful or unlawful belligerent, or

combatant of any kind.   The Executive lacks the authority to order or direct

military officials to detain civilians who were not "carrying a weapon against

American troops on a foreign battlefield."

113.       In the alternative, even under the standards for military detention,

Respondents' actions have denied and continue to deny Petitioner the process

that must be accorded to persons seized and detained by the United States

military in a zone of armed conflict, as established by, among other things, *Hamdi v. Rumsfeld*, the Uniform Code of Military Justice, Army Reg. 190-8, the Third and Fourth Geneva Conventions, arts. 3, 5, and customary international humanitarian law as reflected in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities, and enforceable by this Court under 28 U.S.C. § 1331 and the Supremacy Clause.

114.    Under the Supreme Court's decision in *Boumediene v. Bush*, Petitioner is entitled to the protections of the U.S. Constitution and can assert claims against Respondents arising from their actions violating the Fifth and Sixth amendments to the U.S. Constitution.

## SIXTH CLAIM FOR RELIEF

### Unlawful Arbitrary Detention -
### International Humanitarian and Human Rights Law

115.    Petitioners incorporate by reference all preceding paragraphs as if set forth fully herein.

116.    Respondents, acting under color of law, have acted and continue to act in violation of the Third and Fourth Geneva Conventions, the International Convention on Civil and Political Rights, the American Declaration on the Rights and Duties of Man, and customary international law as reflected, expressed, and defined in the aforementioned multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities, when Respondents directed, ordered, and/or supervised the seizure and military

detention of Petitioner, who is a civilian and did not engage in hostilities against the United States and/or coalition forces.

## SEVENTH CLAIM FOR RELIEF

Arbitrary Denial of Due Process –
International Humanitarian and Human Rights Law

117.     Petitioners incorporate by reference all preceding paragraphs as if set forth fully herein.

118.     To the extent that any defense can be sustained that an armed conflict or a foreign battlefield existed in territories in which Petitioner traveled for lawful purposes, Respondents, acting under color of law, have denied and continue to deny Petitioner the process accorded to persons seized and detained by the United States military in a zone of armed conflict, as established by, inter alia, the Third and Fourth Geneva Conventions, and customary international law as reflected, expressed, and defined in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities, including Hamdi v. Rumsfeld, 542 U.S. 507 (2004), the Uniform Code of Military Justice, and Army Regulation 190-8.

119.     Respondents have violated and continue to violate Petitioner's rights to due process and to be free from forced disappearance and unlawful prolonged arbitrary detention as guaranteed by Common Article 3 of the Geneva Conventions and as recognized by the Supreme Court in *Hamdan v. Rumsfeld*. Common Article 3 prohibits "the passing of sentences and the carrying out of executions without previous judgment pronounced by a regularly constituted

court affording all the judicial guarantees which are recognized as indispensable by civilized peoples."  Accordingly, Petitioner is entitled to habeas, declaratory, and injunctive relief.

## EIGHTH CLAIM FOR RELIEF

Transfer of Civilian into a Conflict Zone –
International Humanitarian and Human Rights Law

120.     Petitioners incorporate by reference all preceding paragraphs as if set forth fully herein.

121.     Respondents' transfer of Petitioner Hamidullah to a theater of conflict is in direct conflict with the underlying object and purpose of the Third and Fourth Geneva Conventions, and customary international law as reflected, expressed, and defined in multilateral treaties and other international instruments, all of which prohibit the transfer of a detainee to a combat zone.

122.     Article  45 of the Fourth Geneva Convention sets limitations on the transfer of prisoners  to other countries:

Protected persons may be transferred by the Detaining Power only to a Power which is a party to the present Convention and after the Detaining Power has satisfied itself of the willingness and ability of such transferee Power to apply the present Convention. If protected persons are transferred under such circumstances, responsibility for the application of the present Convention rests on the Power accepting them, while they are in its custody. Nevertheless, if that Power fails to carry out the provisions of the present Convention in any important respect, the Power by which the protected persons were transferred shall, upon being so notified by the Protecting Power, take effective measures to correct the situation or shall request the return of the protected persons. Such request must be complied with.

In no circumstances shall a protected person be transferred to a country where he or she may have reason to fear persecution for his or her political opinions or religious beliefs.

123.     The provisions of this Article forbid the U.S. from transferring Petitioner to Afghanistan given that there is no indication that any prisoner transferred to Afghanistan in the past has been treated according to the Geneva Conventions.

124.     Furthermore, it would be irrational, and a violation of international and humanitarian law, to transfer Petitioner to Afghanistan since Petitioner had no connection with Afghanistan prior to Respondents' transferring him there.

## NINTH CLAIM FOR RELIEF

### Mistreatment of a juvenile in U.S. custody

125.     Petitioners incorporate by reference all preceding paragraphs as if set forth fully herein.

126.     Petitioner Hamidullah was just 14 years and 8 months old at the time that he was first detained by Respondents.

127.     Petitioner's treatment violates the Optional Protocol to the Convention on the Rights of the Child on the Involvement of Children in Armed Conflict, July 5, 2000, arts. 1-4, 6, 7, GA Res. 263, UN GAOR, 54[su'th'] Sess., Supp. 49, UN Doc. A/RES/54/263 [Optional Protocol to the CRC]. The United States ratified the Optional Protocol to the CRC on December 12, 2002, and it entered into force for the United States on January 23, 2003.

128.     Petitioner's treatment violates the International Covenant on Civil and Political Rights, Oct. 5, 1977, arts. 6, 27, 999 U.N.T.S. 171 [ICCPR]. The United States ratified the ICCPR on June 8, 1992, and it entered into force for the United States on September 8, 1992.

129.     Petitioner's treatment violates the Convention on the Rights of the Child,

Feb. 16, 1995, arts. 1, 38, 1577 U.N.T.S. 3 [CRC].  Even though the US has not ratified the CRC, the provisions of law contained therein with respect to the rights of juveniles have now become *jus cogens.*

130.     Petitioner's treatment violates the Geneva Conventions and their Additional Protocols, which provide extra protection for children not taking part in the hostilities. See, e.g., Geneva Convention Relative to the Protection of Civilian Persons in Time of War, Aug. 12, 1949, arts. 51(2), 76(5), 82, 85(2), 89, 94, 119(2), and 132, 75 U.N.T.S. 287 [GCIV]; Protocol Additional to the Geneva Conventions, Relating to the Protection of Victims of Non-International Armed Conflicts, Dec. 12, 1977, art. 4(3)(d), 1125 U.N.T.S. 609 [Protocol II or APII]. The United States has ratified GCIV, which entered into force for the United States on February 2, 1956.   While the United States has not ratified Protocol II, the provisions of that protocol have now, similarly, entered into customary international law.

131.     Petitioner's treatment violates the legal rights that are set out in the International Committee of the Red Cross, Advisory Service on International Humanitarian Law: Legal Protection of Children in Armed Conflict (2003).

132.     Petitioner's treatment violates the legal rights that are set out in the International Committee of the Red Cross, Summary Table of IHL Provisions Specifically Applicable to Children (2003) [IHL Summary Table].

133.     The United Nations Standard Minimum Rules for the Administration of Juvenile Justice also set out the rights of juveniles.  See G.A. Res. 40/33, U.N.

GAOR, 40[su'th'] Sess., Supp. No. 53, at 207, U.N. Doc. A/40/53 (1985) [The Beijing Rules].  These rules are also being flouted by the continued detention and treatment of Petitioner in Bagram.

134.     Likewise Respondents are violating the United Nations Rules for the Protection of Juveniles Deprived of their Liberty. G.A. Res. 45/113, U.N. GAOR, 45[su'th'] Sess., Supp. No. 49A, at 205, U.N. Doc. A/45/49 (1990).

135.     In addition to these two documents, numerous Security Council resolutions on the involvement of children in armed conflicts demonstrate the importance of this issue to the international community. See, e.g., S.C. Res. 1261, U.N. SCOR, U.N. Doc. S/Res/1261 (1999); S.C. Res. 1314, U.N. SCOR, U.N. Doc. S/Res/1314 (2000); and S.C. Res. 1379, U.N. SCOR, U.N. Doc. S/Res/1379 (2001).  Respondents have violated Petitioner's rights pursuant to these resolutions of the Security Council.

136.     A significant attempt to elaborate on the special rights of children comes from the Inter-American Court of Human rights in its advisory opinion on the Legal Status and Human Rights of the Child. The Inter-American Court of Human Rights has jurisdiction to entertain a request for an advisory opinion from Member states of the Organization of American States (OAS) or from the Inter-American Commission on Human Rights. American Convention on Human Rights, June 1, 1977, art. 64(1), 1144 U.N.T.S. [American Convention]. Article 64 does not limit the advisory opinions to States parties to the Convention, but extends it to "member States of the organization." *Id.*  The United States is not a

party to the American Convention, but it is a member of the OAS. See Charter of the Organization of American States, Apr. 30, 1948, 119 U.N.T.S. 3 [OAS Charter]. The United States ratified the Charter on June 15, 1951, and it entered into force for the United States on December 13, 1951.  Respondents, in their detention and treatment of Petitioner, have violated the Inter-American Court's advisory opinion on the Legal Status and Human Rights of the Child.

## VI.  PRAYER FOR RELIEF

**WHEREFORE**, Petitioners pray for relief as follows, requesting that this Court:

1. Grant Petitioner Wakeel Khan's Request for Next Friend Petitioner status, as Next Friend of Petitioner Hamidullah;

2. Order that Petitioner Hamidullah be released from Respondents' unlawful custody; or, in the alternative, order Respondents to establish in this Court a lawful basis for the initial and continued detention of Hamidullah;

3. Order Respondents to allow counsel to meet and confer with Petitioner Hamidullah in private, unmonitored attorney-client conversation;

4. Order Respondents to cease all interrogation of Petitioner Hamidullah, direct or indirect, while this litigation is pending;

5. Order Respondents to cease all acts of torture or cruel, inhuman, and degrading treatment, and all other outrages upon the personal dignity of Petitioner Hamidullah;

6. Order Respondents to make a prompt return to the Writ in accordance with 28 U.S.C. § 2243;

7. To the extent Respondents contest any material factual allegations in this Petition, schedule an evidentiary hearing at which Petitioners may adduce proof in support of their allegations;

8. Order Respondents to provide notice to this Court and to Petitioners' counsel at least thirty days in advance of any transfer of Petitioner Hamidullah anywhere but to his home in Pakistan;

9. Enjoin Respondents from transferring him into the custody of the Afghani authorities; and

10. Provide Petitioner Hamidullah with habeas, declaratory, and injunctive relief, as well as any other relief as the Court may deem necessary and appropriate to protect the rights of Petitioner Hamidullah under the Constitution, laws, and treaties of the United States.

Dated:  November 17, 2010          MURPHY & SHAFFER LLC


By:   /s/ *William J. Murphy*
     William J. Murphy
     D.C. Bar No. 350371
     John J. Connolly
     Bar No. MD09537 (D.C. Bar No. 495388)

     36 S. Charles St., Suite 1400
     Baltimore, Maryland 21201
     Tel: (410) 783-7000

Clive A. Stafford Smith*
clivelistserve@gmail.com
Cori Crider*
cori@reprieve.org.uk
Tara Murray
(D.C. Bar No. 983134)
tara.murray@reprieve.org.uk
*Reprieve*
P.O. Box 52742
London EC4P 4WS, England
Tel: +44 (0)20 7353 4640
Fax: +44 (0)20 7353 4641

*Counsel for Petitioner*
* counsel previously admitted *pro hac vice* in various Guantánamo Bay cases