UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| ZIA-UR-RAHMAN, *et al.*, <br><br> Petitioners, <br><br> v. <br><br> ROBERT GATES*, et al.*, <br><br> Repondents. | No. 10-cv-320-EGS |

### DECLARATION OF DAPHNE EVIATAR

I, Daphne Eviatar, hereby declare:

1.  I am currently the Senior Associate in the Law and Security Program at Human Rights First, a non-profit, nonpartisan human rights organization based in New York, NY and Washington, DC.  In this capacity I investigate and report on U.S. national security policies and practices and their human rights implications.

2.  I received a Juris Doctorate from NYU Law School and a graduate degree in Journalism from Columbia University.  I am an attorney licensed to practice in the State of New York.

3.  I make this declaration in support of Plaintiffs' Opposition to Respondents' Motion to Dismiss and Motion for Jurisdictional Discovery in the above-captioned case.

4.  Both in my current position and in my former career as a journalist for ten years, I have conducted extensive research on U.S. detention operations in Afghanistan, focusing in particular on the U.S. prison facility at Bagram Airfield.  The current detention facility, which opened in late 2009, is known as the Detention Facility at Parwan ("DFIP").  Before DFIP

Exhibit 40

opened, detainees were held at another facility, known as the Bagram Theater Internment Facility ("BTIF").

5. Between February 3 and February 13, 2011, I travelled to Afghanistan to observe Detainee Review Board ("DRB") hearings at the invitation of the U.S. government. While in Afghanistan, I spoke with several U.S. military officials and members of the U.S. Department of State about the conditions at the U.S. prison facility in Bagram, and the DRB process that takes place there. I also interviewed seven former Bagram detainees about their experiences in detention at Bagram. My interviews covered the conduct of the former detainees' DRB hearings, and the effectiveness and helpfulness of their personal representatives. A consultant retained by Human Rights First conducted at least six additional interviews of former Bagram detainees in late October and early November 2010. The information in this declaration is based on my personal observations of DRBs, my discussions with U.S. officials, the accounts of DRB proceedings that I received directly from former detainees, and my review of the detailed interview notes prepared by the Human Rights First's consultant.

6. While at the DFIP, I observed an Afghan criminal trial of a Bagram detainee. The trial was held at the DFIP, but the judge, lawyers, and other officials involved in the proceeding were all Afghan. U.S. officials told me that 52 Afghan criminal trials have taken place so far at Bagram, resulting in 50 convictions.

7. According to U.S. government officials, the United States is currently detaining approximately 1,550 individuals at the DFIP. This is a very significant increase from historical levels. Before 2009, the detainee population at Bagram consisted of about 600 individuals.

8. At the DFIP, I observed DRB hearings in the cases of four Bagram detainees. DRB hearings comprise two parts: an open session at which the detainee is permitted to attend

and a closed session during which classified information is presented outside of the detainee's presence. I was only permitted to observe open sessions.

9. Each detainee at Bagram is assigned a Personal Representative. According to military officials at Bagram, there are now a total of 15 Personal Representatives available to represent all Bagram detainees. Personal representatives are not lawyers.

10. Based on my personal observations, it is apparent that Personal Representatives are unable to provide the level of representation that could be offered by competent legal counsel. Personal representatives introduced little or no evidence in the DRBs that I observed. They posed few questions, and the questions that they did ask were not probing. In general, personal representatives did not play a significant role in the conduct of the DRB hearings. A competent lawyer would have been able to advocate much more effectively on behalf of a detainee.

11. According to the former detainees I interviewed, personal representatives were of little help to detainees. The personal representatives assigned to these detainees did not gather factual evidence tending to prove a detainee's innocence. At best, personal representatives were able to arrange for family members and village elders to appear at a detainee's DRB hearing as character witnesses. Several former detainees told me that they did not feel that they were able to trust their personal representatives or to confide in them.

12. The government's evidence in DRB hearings is introduced by an official known as the Recorder. In contrast to personal representatives, Recorders are trained military lawyers.

13. A significant portion of each DRB hearing is conducted in closed session, from which the detainee is excluded. Classified evidence is introduced during these closed sessions.

3

14. It appears that there is little or no effort to minimize the amount of evidence that is withheld from the detainee in the DRB hearing, whether by declassifying documents, providing redacted versions of partially-classified documents, providing unclassified summaries of classified information, or by other means.

15. I spoke with a military official responsible for declassifying and redacting documents for use in legal proceedings at Bagram, including both DRB hearings and Afghan criminal trials. He told me that his work consisted almost exclusively of redacting documents for use in Afghan criminal trials of Bagram detainees. He also told me that documents to be used in DRB hearings are rarely, if ever, redacted, and are even more rarely declassified. Apart from an initial cursory summary for detainees of the basis for their detention, it does not appear that the military ever prepares unclassified summaries of classified evidence for use in DRB hearings.

16. Military officials at Bagram confirmed to me that the DRB panel is only empowered to make recommendations about the disposition of a detainee's case. The DRB does not have the authority to order detainees released, or to insist on any other disposition. The actual decision as to whether a detainee will be released, will be transferred to Afghan custody or to a third country, or will remain in U.S. custody is not made by the DRB. It is made instead by the Commander of the DFIP or his designee, officials who do not participate in the DRB hearing. There do not appear to be any standards guiding or limiting the determinations of the Commander or his designee.

17. In addition to recommending a disposition of each detainee's case, DRBs make a recommendation as to whether a detainee is an "Enduring Security Threat." The criteria for designating an individual an "Enduring Security Threat" appear to be classified. The

consequences of this designation are unclear, although it appears that detainees designated an Enduring Security Threat are much less likely to be released or transferred out of U.S. custody.

18.     Based on my interviews with former detainees and my knowledge of detention operations, it appears that many Afghans held at Bagram are detained by the United States on the basis of false accusations lodged by local adversaries.  Disputes between families over issues such as land or past violence are common in Afghanistan.  Individuals may make false accusations against adversaries in order to induce the United States to detain them.  These accusations are nearly always classified, and so are withheld from the detainee.  As a result, Afghan detainees do not learn the substance of the accusations against them or the identity of their accuser, and have no opportunity to demonstrate that these accusations are false or that the accuser is likely to be motivated by a personal or familial vendetta.  The former detainees with whom I spoke were unanimous in their view that a significant portion of the Afghan detainee population at Bagram is being held on the basis of such untested accusations.  Moreover, because Personal Representatives are not taught the local languages and usually have no prior experience with Afghan culture, they may not be familiar with these sorts of disputes or able to adequately investigate them and their client's defense.

19. Based on statements made to me by U.S. officials, it appears that several third-country nationals recommended for release from U.S. custody nevertheless remain in U.S. custody for months after release has been approved. I was told that in at least one instance, a third-country national's release determination was rescinded in a subsequent DRB hearing, which took place because he had not been released for six months after the first DRB hearing recommending release. U.S. officials stated that the release determination in that case was rescinded despite the absence of new evidence against the detainee. U.S. officials also stated that third-country nationals approved for release remain in custody due to holds placed by officials in Washington, D.C. There was no indication that only third-country nationals—as opposed to Afghan detainees—are subjected to continued detention even after they have been approved for release.

I declare under penalty of perjury the foregoing is true and correct to the best of my knowledge and belief. Executed this 18th day of February, 2011.

_____
Daphne Eviatar