UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| HAMIDULLAH,<br>    Detainee,<br>    United States Air Force Base at<br>    Bagram, Afghanistan, and<br><br>WAKEEL KHAN<br>    as Next Friend to HAMIDULLAH<br><br>    Petitioners,<br><br>        v.<br><br>BARACK OBAMA<br>    President of the United States,<br><br>ROBERT M. GATES<br>    Secretary of Defense,<br><br>COL. JACK L. BRIGGS II<br>    Commander,<br><br>    and<br><br>JOHN AND/OR JANE DOES Nos. 1 - 5,<br>    Custodians,<br><br>    Respondents. | Civil Action No.  10-758 (JDB) |

## MEMORANDUM OPINION

Before the Court is [11] respondents' motion to dismiss [8] Hamidullah's amended petition for a writ of habeas corpus ("Habeas Pet."). Hamidullah, a citizen of Pakistan, has been

1

detained by the United States at Bagram Airfield in Afghanistan ("Bagram") for several years. Habeas Pet. ¶ 25.

Whether federal courts may entertain habeas petitions filed by alien detainees held abroad has been the subject of intense litigation over the last decade. Section 7 of the Military Commissions Act of 2006 ("MCA"), 28 U.S.C. § 2241(e)(1), strips courts of jurisdiction over such petitions, but in some instances the Constitution's Suspension Clause invalidates § 7. In Boumediene v. Bush, 553 U.S. 723 (2008), the Supreme Court explained that "at least three factors are relevant in determining the reach of the Suspension Clause":

> (1) the citizenship and status of the detainee and the adequacy of the process through which that status determination was made; (2) the nature of the sites where apprehension and then detention took place; and (3) the practical obstacles inherent in resolving the prisoner's entitlement to the writ.

Id. at 766. After weighing these factors, the Supreme Court determined that detainees at Guantanamo Bay in Cuba could file habeas petitions. Id. at 798. But applying the same test, the D.C. Circuit later determined that three detainees at Bagram were not entitled to challenge their detentions through habeas corpus petitions. Al Maqaleh v. Gates, 605 F.3d 84, 99 (D.C. Cir. 2010). The D.C. Circuit concluded that although the first factor favored the petitioners, the second factor "weigh[ed] heavily" against them and the third weighed "overwhelmingly" against them. Id. at 95-98.

Hamidullah, along with the Al Maqaleh petitioners, now argues that new evidence undermines the rationale of the D.C. Circuit's decision. See Ptr.'s Opp. to Resp. Mot. to Dismiss [ECF 13] ("Ptr.'s Opp.") at 7-16. A combined hearing was held on Hamidullah's and the Al Maqaleh petitioners' habeas corpus petitions on July 16, 2012. The Court has now issued an

opinion dismissing the Al Maqaleh petitions on the ground that none of the new evidence would have changed the D.C. Circuit's decision. See 10/19/2012 Mem. Op. [06-cv-1669, ECF 85]. That opinion resolves most of the issues in this case as well. See Ptr.'s Opp. at 8 ("Petitioner in this case acknowledges that the Court of Appeals' decision in Al Maqaleh, as that decision is interpreted and applied by this Court on remand, will govern certain jurisdictional factors that are also at issue in this case.").

Hamidullah does raise one argument, however, that was not at issue in Al Maqaleh. Hamidullah claims (and the claim must be accepted as true for purposes of this motion) that he was captured by the United States when he was fourteen years old and that he is eighteen or nineteen years old today. Tr. of Mot. Hrg. (July 16, 2012) at 87. He therefore argues that "not only [is] the privilege of the writ for minors . . . protected by the Constitution, but . . . it is somewhat more robust than the concomitant right among adults," and that he should accordingly be able to bring a habeas corpus petition even if adult detainees at Bagram cannot do so. Ptr.'s Opp. at 18. Neither the Supreme Court in Boumediene nor the D.C. Circuit in Al Maqaleh had occasion to address a petition by a detainee who was a juvenile at the time of capture, so this Court must determine in the first instance whether age affects the scope of the Suspension Clause application.[1]

## STANDARD

"[R]esponding to a habeas petition with a motion to dismiss is common practice." White v. Lewis, 874 F.2d 599, 603 (9th Cir. 1989) (citing Murray v. Carrier, 477 U.S. 478, 483 (1986)).

---

[1] Hamidullah does not address whether the Court should consider his age at the time of his capture, at the time he filed his habeas petition, or at the time the habeas petition is adjudicated. In light of the Court's disposition of his petition, that issue need not be decided here.

A motion to dismiss for lack of subject matter jurisdiction in habeas cases, like jurisdictional motions in other civil cases, is subject to review under the standards of the Federal Rules of Civil Procedure.  See Rasul v. Bush, 215 F. Supp. 2d 55, 61 (D.D.C. 2002), aff'd, Al Odah v. United States, 321 F.3d 1134 (D.C. Cir. 2003), rev'd on other grounds, Rasul v. Bush, 542 U.S. 466 (2004) (applying Fed. R. Civ. P. 12(b)(1) to the government's motion to dismiss a pending habeas petition on jurisdictional grounds); see also In re Guantanamo Detainee Cases, 355 F. Supp. 2d 443, 453 (D.D.C. 2005) ("The respondents . . . seek dismissal of all counts as a matter of law under Fed. R. Civ. P. 12(b)(6) for failing to state a claim upon which relief can be granted.  In the alternative, the respondents seek a judgment based on the pleadings pursuant to Fed. R. Civ. P. 12(c)."), vacated, Boumediene v. Bush, 476 F.3d 981 (D.C. Cir. 2007), rev'd, 553 U.S. 723 (2008).

Under Rule 12(b)(1), the person seeking to invoke the jurisdiction of a federal court – petitioner here – bears the burden of establishing that the court has jurisdiction.  See US Ecology, Inc. v. U.S. Dep't of Interior, 231 F.3d 20, 24 (D.C. Cir. 2000) (citing Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 103-04 (1998)); see also Grand Lodge of Fraternal Order of Police v. Ashcroft, 185 F. Supp. 2d 9, 13 (D.D.C. 2001) ("[A] Rule 12(b)(1) motion imposes on the court an affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority."); Pitney Bowes, Inc. v. U.S. Postal Serv., 27 F. Supp. 2d 15, 19 (D.D.C. 1998).  Although a court must accept as true all of the petitioner's factual allegations when reviewing a motion to dismiss pursuant to Rule 12(b)(1), see Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 164 (1993), "'factual allegations . . . will bear closer scrutiny in resolving a 12(b)(1) motion' than in resolving a 12(b)(6) motion for failure to

state a claim." Grand Lodge, 185 F. Supp. 2d at 13-14 (quoting 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1350 (2d ed. 1990)).  At the stage of litigation when dismissal is sought, a petitioner's habeas petition must be construed liberally, and the petitioner should receive the benefit of all favorable inferences that can be drawn from the alleged facts.  See EEOC v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 624 (D.C. Cir. 1997).  A court may consider material other than the allegations in the habeas petition in determining whether it has jurisdiction to hear the case, so long as it still accepts the factual allegations in the habeas petition as true.  See Jerome Stevens Pharmaceuticals, Inc. v. FDA, 402 F.3d 1249, 1253-54 (D.C. Cir. 2005); St. Francis Xavier Parochial Sch., 117 F.3d at 624-25 n.3; Herbert v. Nat'l Acad. of Scis., 974 F.2d 192, 197 (D.C. Cir. 1992).

## ANALYSIS

Hamidullah makes two arguments for why a petitioner's age is relevant to the jurisdictional question presented here.  The first is primarily historical: he contends that "early history suggests . . . that [the habeas corpus right for juveniles] is somewhat more robust than the concomitant right among adults."  Ptr.'s Opp. at 18.  If this statement is correct, it might mean that Hamidullah's age does affect the Boumediene analysis.  The Court concludes, however, that petitioner has failed to support this argument.

Hamidullah begins by pointing out that "one of the chief offices" of habeas "[i]n the early days of the Republic" was freeing underage soldiers from detention by their commanding officers, and that habeas petitions were also brought by juveniles in "a wide variety of child-detention regimes, ranging from work apprenticeships to formal slavery."  Ptr.'s Opp. at 17-18 (citations omitted).  This may well be true, but the fact that juveniles could file habeas corpus

petitions is no reason to believe that their habeas rights are "more robust than" those of adults. There is no dispute that minors in the United States can file habeas petitions (and, indeed, may have more occasion to do so than adults; for instance, an adult would not normally be successful in seeking habeas relief from military service). Respondents do not contend otherwise. Rather, the question is whether there is anything jurisdictionally unique about juveniles' petitions.

Hamidullah also tries to establish the special status of juveniles' habeas petitions by pointing out that "courts exercised an unusual form of discretion in habeas petitions filed on behalf of juveniles; although they were obligated to free the juvenile from improper restraint, they could choose the best person to take custody thereafter." Id. at 18. But again, that discretion does not show that juveniles' habeas rights were "more robust" than adults' rights; rather, such discretion follows naturally from the differences between minors and adults. Only a juvenile needs a new custodian after being granted a writ of habeas corpus; an adult can simply be released into his or her own custody.

Hamidullah's next argument is that "[i]n juvenile matters, moreover, courts sometimes acknowledged authority to issue the writ to an in-state 'jailer' even when the child was located elsewhere." Id. at 19. But the opinions on which Hamidullah relies did not turn on any special habeas rights of juveniles; they merely discussed the legal questions based on the facts at hand. See People ex rel. Billotti v. New York Juvenile Asylum, 68 N.Y.S. 279, 279 (App. Div. 1st Dep't 1901); In re Jackson, 15 Mich. 417, 1867 WL 3329 at *5, *8 (1867). And importantly, as Hamidullah concedes, "this authority was recognized in some nonjuvenile cases as well," Ptr.'s Opp. at 19 – including, recently, in Guantanamo detainee cases involving adults. See Rasul v. Bush, 542 U.S. 466, 478-79 (2004). Hamidullah has not shown any actual link between a

detainee's age and the authority to issue the writ to an in-state jailer, nor has he shown that it was more common to issue such writs when the detainee was a juvenile. Hence, this argument also does not set juvenile cases apart from adult cases.

Finally, Hamidullah cites a law review article that observes that early English judges were more likely to conduct factual discovery for "detentions the justices seem[ed] to have disliked," such as "child and spousal custody disputes." Ptr.'s Opp. at 18 (citing P. Halliday, The Suspension Clause: English Text, Imperial Contexts, and American Implications, 94 VA. L. REV. 575, 610-11 (2008)). The footnote supporting this statement, however, cites a spousal custody case but no child custody cases. See P. Halliday, The Suspension Clause, 94 VA. L. REV. at 611 n.90. And a single sentence in a law review article musing that early English justices "seem[ed] to have disliked" child custody cases is not enough to tip the balance under Boumediene. In sum, then, there is simply no authority for the proposition that by itself being a juvenile matters to the jurisdictional analysis in habeas cases, or that the habeas petitions of juveniles have been treated in meaningfully different ways than those of adults. Whatever persuasive arguments Hamidullah may have in favor of his right to the protection of the writ, they are not found in historical habeas caselaw.

Hamidullah's second argument is based on the text of Boumediene. As explained above, the Supreme Court has held that "at least three factors are relevant in determining the reach of the Suspension Clause":

> (1) the citizenship and status of the detainee and the adequacy of the process through which that status determination was made; (2) the nature of the sites where apprehension and then detention took place; and (3) the practical obstacles inherent in resolving the prisoner's entitlement to the writ.

Boumediene, 553 U.S. at 766 (emphasis added). Hamidullah contends that the reference to the "status of the detainee" encompasses "juvenile status." Ptr.'s Opp. at 19-20, 31. The Court is not persuaded that this is so, but the question is difficult, primarily because neither the Supreme Court nor the D.C. Circuit has devoted much attention to the "status" factor. As petitioner acknowledges, both the Supreme Court in Boumediene and the D.C. Circuit in Al Maqaleh discussed status only in the context of "the detainee's 'enemy' classification, as initially determined by the military." Id. at 20 (citing Boumediene, 553 U.S. at 739; Al Maqaleh, 605 F.3d at 96). Those two cases make clear that "enemy alien" or "enemy combatant" or "war criminal" would be a relevant status, but neither case discusses what else the word "status" could encompass. Moreover, neither case explains why the "status" inquiry is important; to some extent, it seems to be a merits inquiry wrapped inside the jurisdictional question. Hence, as this Court has previously observed, the more "fertile ground for inquiry is not the detainee's status itself, but rather the process used to make that determination." Al Maqaleh v. Gates, 604 F. Supp. 2d 205, 219 (D.D.C. 2009), rev'd on other grounds, 605 F.3d 84 (D.C. Cir. 2010).

      Petitioner nonetheless contends that "juvenile" is a relevant status. It is true that the normal definition of "status" could include age, and petitioner correctly notes that neither the D.C. Circuit nor the Supreme Court has ever stated that enemy classifications are "the only relevant statuses available," Ptr.'s Opp. at 20. In addition, petitioner cites a great deal of both international and domestic law that differentiates between juveniles and adults to show that "juvenile" is indeed a relevant status in some settings. Ptr.'s Opp. at 20-26.

      The trouble is that petitioner's argument is not supported by habeas caselaw. Since Boumediene, it appears that no court has interpreted "status" to mean anything other than "enemy

combatant" or some variant thereof.  Any number of detainee characteristics could play into habeas corpus adjudications – age, disability, mental or physical health – but petitioners have not cited any case that has found a factor of this type to be a "status" relevant to the threshold jurisdictional question under the Boumediene test.  And, as noted above, petitioner has found no support for this argument in his examination of the historical caselaw.

Even if being a juvenile is a relevant status, however – or is an additional factor in the Boumediene test, see Boumediene, 553 U.S. at 766 ("at least three factors are relevant" to the scope of the Suspension Clause) (emphasis added) – that does not end the inquiry.  The Court accepts petitioner's argument that if age is a relevant factor at all, it weighs somewhat in favor of his entitlement to the writ.  The Court also agrees with petitioner that the procedural protections afforded to detainees at Bagram may be less trustworthy in the case of juveniles.  Ptr.'s Opp. at 30-33.  As petitioner notes, the lack of an appointed lawyer puts more of the onus of the process on the detainee, and juveniles are less suited than are adults to bearing that burden.  On the other hand, the procedural protections for detainees at Bagram have improved somewhat since the D.C. Circuit's decision, and Hamidullah is now nineteen, which together may mitigate the significance of the petitioner's arguments on the "adequacy of process" factor.  See Resp. Mot. to Dismiss at 18-20.

The other Boumediene factors, however, have not changed.  The "sites where apprehension and then detention took place" are the same as they were when the court of appeals issued its decision.  And although petitioner argues that the "practical obstacles" inherent in adjudicating a juvenile's habeas petition are "attenuated," this Court does not agree.  See Ptr.'s Opp. at 30-33.  That argument rests on two grounds: first, there are far fewer juvenile detainees

than adult detainees, and second, determining whether a petitioner is a juvenile is a relatively straightforward question. But the number of potentially affected detainees was also quite small in Al Maqaleh, yet the D.C. Circuit still found that practical obstacles weighed "overwhelmingly" in favor of the government. 605 F.3d at 97. And even if the number of actual juveniles detained at Bagram is small, the number of relatively young detainees who could claim to be juveniles in an attempt to have a habeas petition heard may be considerably larger.

Petitioner's view that adjudicating a juvenile's habeas petition is easier than adjudicating an adult's petition rests on the mistaken premise that a juvenile petitioner could be automatically released. Ptr.'s Opp. at 31-32. As the respondents explain, however, this is indisputably not true. The use of child soldiers may be repellent, but the fact is that some enemy combatants are minors, and § 7 of the MCA contains no exceptions or special provisions for minors. See Resp. Mot. to Dismiss at 8-9; 28 U.S.C. § 2241(e)(1). Hence, adjudicating a habeas petition for a juvenile is actually likely to be more complicated than adjudicating such a petition for an adult. The reviewing court would first have to decide whether the petitioner was in fact a juvenile, which is no simple task given most detainees' lack of any records, the fact that the detainee himself may not know his birthdate, and the limited reliability of scientific testing. After making that determination, the court would then have to adjudicate the merits of the petition just as it would for an adult, although the petitioner's age might add some complexity to the merits analysis as well. See Tr. of Mot. Hrg. (July 16, 2012) at 92.

In sum, then, the first Boumediene factor is somewhat stronger for petitioners if juvenile status is a part of the Boumediene test, and the other two factors are unchanged. The Court finds that this is not enough to tip the balance towards petitioner under the D.C. Circuit's decision.

The D.C. Circuit did not just find against the Al Maqaleh petitioners, it did so emphatically. The court acknowledged that petitioners had "a strong argument" under the first factor alone, but it immediately went on to find that the second factor "weigh[ed] heavily in favor of" the government and that the third factor did so "overwhelmingly." 605 F.3d at 96-97. Most strikingly, nothing in the opinion implies that the question was even close. The court just appeared to view Bagram as well beyond the reach of the Suspension Clause, both because it was "simply . . . not true" that the United States had de facto sovereignty over Bagram and because Bagram was an "active theater of war." Id. at 96-98. The location of the detention site absorbed most of the court's attention both at oral argument and in the opinion, and that location remains the same now.

Reweighing the three Boumediene factors in a somewhat different context is necessarily a difficult and imprecise task, but given the clear focus of the D.C. Circuit's opinion, this Court cannot find that a relatively stronger argument on the first prong would overcome the two prongs that weighed "heavily" and "overwhelmingly" in favor of the government. Because Al Maqaleh is binding on this Court, and because petitioner has not undermined the foundation of the court of appeals' opinion in that case, Hamidullah's petition must be dismissed. A separate order accompanies this opinion.

        /s/ John D. Bates  
        JOHN D. BATES  
        United States District Judge

Dated: October 19, 2012